**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES,**

     **Plaintiff,**

**v.**                                                                                            **No. 21-cr-01501-JCH**

**RUMALDO PESHLAKAI,**

     **Defendant.**

## MEMORANDUM OPINION AND ORDER

The United States charged Defendant Rumaldo Peshlakai with possessing a firearm after a felony conviction. *See* 18 U.S.C. § 922(g)(1). This opinion addresses three pretrial motions.

First, Mr. Peshlakai seeks dismissal because he argues that the felon-in-possession statute interferes with his treaty-based right to hunt and protect livestock. *See Motion to Dismiss Indictment for Lack of Jurisdiction or, in the Alternative, to Present Affirmative Defense Based on Treaty-Recognized Right to Bear Arms for the Purpose of Hunting and Protecting Livestock* (ECF No. 52). The Tenth Circuit foreclosed this argument, so the Court will not dismiss this case.

Second, Mr. Peshlakai claims that FBI agents did not adhere to Navajo Nation's federal-detainer statute, and so the FBI agents arrested him without jurisdiction. *See Motion to Suppress Evidence* (ECF No. 53). Because Mr. Peshlakai was never in Navajo custody for a violation of Navajo law, however, the FBI agents did not violate the federal-detainer statute.

Third, the United States asks to call Forensic Expert Jerrilyn Conway about DNA evidence without also calling four other biologists who worked on the case. *See Motion in Limine Regarding Testimony of the DNA Expert Analyst* (ECF No. 51). The Court defers ruling on the admissibility of Examiner Conway's testimony or the recognition of her as an expert. Still, the Court holds

(subject to new information) that the Confrontation Clause neither bars Examiner Conway from testifying nor requires the United States to call the four other biologists.

## I.    Background

### A.    Events Preceding Arrest

The criminal complaint provides this section's facts. Compl. (ECF No. 1). Three background facts underlie the felon-in-possession charge and the Court's jurisdiction. First, in 2001, Mr. Peshlakai was convicted of felony assault. *Id.* ¶ 4. Second, the present case's events occurred within the exterior boundaries of the Navajo Reservation. *Id.* ¶ 30. And third, Mr. Peshlakai and his wife, C.P., are enrolled members of Navajo Nation. *Id.* ¶ 31.

On September 23, 2021, C.P. called Navajo Police Department ("NPD") dispatch. *Id.* ¶ 3. She reported that Mr. Peshlakai assaulted her, kidnapped their four children, and fled in a truck with a firearm. *Id.* ¶¶ 3, 4. NPD Criminal Investigator Samantha Yazzie contacted the FBI. *Id.* ¶ 2. NPD officers eventually located the truck, which Mr. Peshlakai had parked in a secluded area near his residence. *Id.* ¶ 9. FBI agents arrived on the scene. *Id.* ¶ 10. The NPD officers and FBI agents determined that the vehicle was unoccupied. *Id.* Still, the NPD officers found an empty box of ammunition and a nine-millimeter round in the truck. *Id.*

The NPD officers noticed footprints walking away from the truck. *Id.* ¶ 11. Both groups of officers tracked the footprints. *Id.* After six miles, they observed vehicle tracks and inferred that a vehicle picked up Mr. Peshlakai and the children. *Id.* The foot search concluded, and the officers set up a command post at NPD's Window Rock station. *Id.*

Mr. Peshlakai called NPD dispatch that evening. *Id.* ¶ 12. He spoke to the FBI agents. *Id.* Mr. Peshlakai said that the children were safe at his mother's house. *Id.* ¶ 13. He refused to reveal

his location or meet with FBI agents that evening. *Id.* He would, however, surrender himself in the morning. *Id.* The NPD officers and the FBI agents then located the children. *Id.*

**B.      Arrest**

The facts in this section come from Mr. Peshlakai's testimony at the May 31, 2023, suppression hearing and FBI documents. Mr. Peshlakai surrendered himself on September 24, 2021, at NPD's Window Rock station. Tr. Hr'g 46 (testimony of Rumaldo Peshlakai). He approached the station's main entrance. Two officers met him outside. A third officer arrived in an NPD vehicle. All three wore NPD uniforms. Mr. Peshlakai also suggested that Investigator Yazzie was present. *See id.* at 46, 48.

The officer who arrived in the vehicle handcuffed Mr. Peshlakai in "a rough manner." He told Mr. Peshlakai that he was under arrest. The officer then put Mr. Peshlakai in the NPD vehicle and took him to the NPD booking area. Upon entering the booking area, Mr. Peshlakai took a COVID test. As Mr. Peshlakai waited for the results to process—but before Mr. Peshlakai was booked—Investigator Yazzie instructed the officers to take Mr. Peshlakai to another building. The officers brought Mr. Peshlakai to the rear of the police station.[1] *See id.* at 47-49.

Investigator Yazzie escorted Mr. Peshlakai into the rear of the building. A plain-clothed officer, whom Mr. Peshlakai identified as an NPD officer, was also there. Thirty to forty-five minutes later, FBI Agent Curtis Imming arrived. Agent Imming read Mr. Peshlakai his *Miranda* rights and interviewed him. Mr. Peshlakai was uncuffed either right before or after the interview began. *See id.* at 48, 50-53; *see also* Gov.'s Ex. 2 (ECF No. 56-2) (*Miranda* waiver form).

---

[1] Mr. Peshlakai's testimony is ambiguous about whether he was taken to a different building or a different part of the same building. Either way, he was taken to a different place than the booking area. *See* Tr. Hr'g 52.

Mr. Peshlakai gave information to Agent Imming during the interview. *See* ECF No. 53, at 4 (noting statements included "the location of his cell phone, consumption of alcohol that night, [and] information about the domestic dispute with [C.P.]"); ECF No. 56, at 2 (noting statements included "information about the assault of C.P., taking the children from the home, and the firearms in the [truck] that he used to take the children"). After the interview, FBI agents transported Mr. Peshlakai from Window Rock to the FBI's Gallup office, and then to Cibola County Corrections Center. *See* Tr. Hr'g 53; FBI FD-302 Report (ECF No. 56-3).

An "Arrest and Booking Information Sheet" names the FBI as the arresting agency, Curtis Imming as the arresting agent, and the felon-in-possession statute as the federal charge. *See* Gov.'s Ex. 1 (ECF No. 56-1). An FBI FD-302 report provides that "FBI Special Agent Curtis Lee Imming and NPD Criminal Investigator Samantha Yazzie took Mr. Peshlakai into custody without incident on September 24, 2021." FBI FD-302 Report (ECF No. 62-1). Mr. Peshlakai testified that he is unaware of any pending Navajo Nation charges. Tr. Hr'g 54.

### C.   Events After Arrest

A United States Magistrate Judge approved a criminal complaint on September 26, 2021. Gov.'s Ex. 4 (ECF No. 56-4). Mr. Peshlakai made his initial appearance on September 28, 2021. *See* Mins. (ECF No. 5). And a grand jury indicted Mr. Peshlakai on October 14, 2021, charging him with possessing a firearm after being previously convicted of a felony. *See* Redacted Indictment (ECF No. 14); *see also* 18 U.S.C. §§ 922(g)(1), 924.

On September 29, 2021, FBI agents and assisting agencies found firearms on the path with footprints walking away from the truck. *See* Gov.'s Resp. 2 (ECF No. 57). Swabs were taken from these firearms, and buccal swabs were taken from Mr. Peshlakai. The swabs were submitted to the FBI's DNA Casework Unit. *See* ECF No. 51, at 4.

II.     **Mr. Peshlakai's *Motion to Dismiss Indictment for Lack of Jurisdiction or, in the Alternative, to Present Affirmative Defense Based on Treaty-Recognized Right to Bear Arms for the Purpose of Hunting and Protecting Livestock***

Mr. Peshlakai argues that the felon-in-possession statute does not extend to Navajo Nation. His argument rests on three premises. First, Mr. Peshlakai contends that the felon-in-possession statute is silent on its application to Indians in Indian Country. *See* ECF No. 52, at 6; *see also* 18 U.S.C. § 922(g). Second, Mr. Peshlakai asserts that generally applicable statutes that are silent on their application to Indian Tribes will not so apply if the statute would abrogate a treaty right. *See* ECF No. 52, at 7 (quoting *Nero v. Cherokee Nation of Okla.*, 892 F.2d 1457, 1462-63 (10th Cir. 1989)). Third, Mr. Peshlakai claims that the 1868 Treaty between the United States and Navajo Nation guarantees Mr. Peshlakai a right to possess a firearm for hunting and protecting livestock. *See id.* at 9 (citing Treaty Between the United States of America and the Navajo Tribe of Indians ("1868 Treaty"), Navajo-U.S., arts. II, IX, XIII, June 1, 1868, 15 Stat. 667, 668, 670, 671). Relying on these premises, Mr. Peshlakai concludes that he cannot be punished under § 922(g) because the statute's prohibition of firearm possession would abrogate his treaty right. *See id.* at 12. Mr. Peshlakai seeks dismissal or the ability to assert an affirmative defense at trial. *See id.* at 12-13.

The Tenth Circuit squarely rejected this argument in *United States v. Fox*, 573 F.3d 1050, 1055 (10th Cir. 2009). The defendant there, Dionysius Fox, made almost the exact same arguments as Mr. Peshlakai. *See* Gov.'s Ex. 3 (ECF No. 57-3) (motion to dismiss before district court in *Fox*). Mr. Fox argued that the 1868 Treaty immunized him from the felon-in-possession statute. *See* ECF No. 57-3, at 9. He asked for dismissal or an affirmative defense. *Id.* The Tenth Circuit reasoned that just as all citizens may forfeit their constitutional rights by committing a felony, so too members of Indian Tribes may forfeit their treaty rights. *See id.* at 1054.

Mr. Peshlakai purports to distinguish *Fox*. According to Mr. Peshlakai, *Fox* "held that the Treaty of 1868 [preserved] for the Navajo Nation the right to hunt on reservation lands and that

the hunting rights guaranteed by the Treaty of 1868 may be asserted by individual Navajos." Def.'s Reply 2 (ECF No. 61). This accurately states part of *Fox*'s holding. *See* 573 F.3d at 1054. But *Fox* did not stop there. *Fox* also held that a defendant's felony conviction may result in the forfeiture of a treaty-based rights to possess firearms. *See* 573 F.3d at 1055 ("Just as Mr. Fox lost the opportunity to hunt while physically incarcerated as a result of his conviction, 18 U.S.C. § 922(g)(1) prevents Mr. Fox from hunting with firearms as though it was explicitly part of his sentence for his earlier felonies.").

Perhaps in recognition that *Fox* controls, Mr. Peshlakai also contends that *Fox* misinterpreted the 1868 Treaty and misapplied precedent, including *Nero v. Cherokee Nation of Okla.*, 892 F.2d 1457 (10th Cir. 1989). *See* ECF No. 61, at 10-13. These are arguments that *Fox* was wrongly decided. But these are not arguments that *Fox* is distinguishable or that *Fox* does not bind the Court. This Court must follow Tenth Circuit precedent unless it is overruled by the Tenth Circuit itself or a superseding contrary decision of the Supreme Court. *See Burlington N. & Santa Fe Ry. Co. v. Burton*, 270 F.3d 942, 947 (10th Cir. 2001).

Finally, at the suppression hearing, Mr. Peshlakai argued that three sources of law have superseded *Fox*: *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982); and Navajo Nation's federal-detainer statute, 17 N.N.C. § 1963. *See* Tr. Hr'g 16-17. All fail.

First, only the most expansive reading of *McGirt* would support the view that it superseded *Fox*. *Compare McGirt*, 140 S. Ct. at 2474 (holding that Congress never disestablished the Muscogee (Creek) Reservation), *with Fox*, 573 F.3d at 1055 (holding that a Navajo's treaty-based hunting right does not create immunity from a § 922(g) prosecution). Still, Mr. Peshlakai argues that *McGirt* held that courts can no longer consider practical outcomes of their decisions when

6

they interpret treaties. *See* Tr. Hr'g 15-16; *McGirt*, 140 S. Ct. 2478-79. Even if that were true, *Fox* would still control. True, *Fox* considered the practical outcomes of its decision. *See* 573 F.3d at 1055 ("If we were to read the treaty right as Mr. Fox asks us to, it is hard to see how any Navajo could be convicted of any federal crime of general applicability."). But that floodgates-style reasoning followed *Fox* quoting and interpreting the 1868 Treaty's plain language. *See id.* at 1054-55 (quoting 1868 Treaty, art. I, 15 Stat. at 667) ("The implication seems clear that both signatories to the Treaty envisioned that members of the Navajo Nation committing crimes would lose certain rights under the treaty."). Any arguments that *Fox* erred in its plain-language interpretation of the 1868 Treaty belong before the Tenth Circuit, not this Court.

Second, *Merrion* did not supersede *Fox*. To the contrary, *Merrion* preceded *Fox* by twenty-seven years. *See Merrion*, 455 U.S. 130.

Third, Navajo Nation's federal-detainer statute did not supersede *Fox*. Even if a Navajo statute can supersede Tenth Circuit precedent interpreting a federal statute and a Navajo–United States treaty, the federal-detainer statute is still reconcilable with *Fox*. The federal-detainer statute mandates process before federal officers can obtain custody of an Indian already in Navajo custody for a violation of Navajo law. *See* 17 N.N.C. § 1963. When the federal-detainer statute is triggered, therefore, the United States can follow the statute's procedures to gain custody of an Indian and then prosecute him or her under § 922(g).

In the end, *Fox* binds this Court. The Court will deny Mr. Peshlakai's motion to dismiss.

## III.   **Mr. Peshlakai's *Motion to Suppress***

Mr. Peshlakai argues that the FBI agents violated the Fourth Amendment. *See* ECF No. 53, at 7. To reach a Fourth Amendment violation, Mr. Peshlakai advances the following syllogism:

1. The United States and Navajo Nation's 1868 Treaty guarantees the Navajo a right to establish procedures that the United States must follow before obtaining custody of an Indian.[2]

2. Navajo Nation enacted its federal-detainer statute, 7 N.N.C. § 608, 17 N.N.C. §§ 1962-1966, to implement this treaty right.[3]

3. FBI agents violated the federal-detainer statute when they arrested Mr. Peshlakai.

4. Because the FBI agents violated the federal-detainer statute, the FBI agents violated the 1868 Treaty.

5. Because the FBI agents violated the 1868 Treaty, they exceeded their jurisdiction.

6. Because the FBI agents exceeded their jurisdiction, they violated the Fourth Amendment.

*See* ECF No. 53, at 4-7. As a remedy, Mr. Peshlakai seeks suppression of the evidence and statements obtained as fruits of the federal arrest. *See id.* at 9.

Mr. Peshlakai carries the burden to show that officers' actions implicated the Fourth Amendment. *See United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020). Because his theory of a Fourth Amendment violation is this six-step syllogism, he thus has the burden of

---

[2] Article I of the 1868 Treaty provides,

> If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, *the Navajo tribe agree that they will, on proof made to their agent, and on notice by him, deliver up the wrongdoer to the United States*, to be tried and punished according to its laws . . . .

1868 Treaty, art. I, 15 Stat. at 667 (emphasis added).

[3] The Navajo Nation Council enacted the federal-detainer statute in 2013. *See* An Act Relating to Law and Order and Naabik'íyáti'; Amending Extradition and Detention Provision of Title 7 and Title 17 of the Navajo Nation Code, CJY-29-13, 22d Navajo Nation Council (2013), https://www.nnols.org/wp-content/uploads/2021/02/CJY-29-13.pdf. The Court could not find any judicial opinions interpreting this statute.

proving each step. He fails at Step Three. Said otherwise, Mr. Peshlakai does not meet his burden of proving that the FBI agents violated the federal-detainer statute. As a result, the Court need not address the other steps.

### A.    Interpretation of the Federal-Detainer Statute

The federal-detainer statute begins, "An Indian, whether adult or juvenile, *who is detained by the Navajo Department of Corrections* and who is the subject of a federal detainer request, shall be released by the Department of Corrections to the federal government pursuant to the federal detainer statute, 17 N.N.C. §§ 1962 to 1966." 7 N.N.C. § 608 (emphasis added). The statute's first section limits its scope: the statute does not apply to every Indian subject to a federal investigation. Rather, the statute is limited to Indians detained by the Navajo Department of Corrections.

The statute's second section, a policy statement, confirms the statute's focus on Indians who are subject to a concurrent federal investigation but who are already in Navajo custody for a violation of Navajo law. The policy statement reads, in part, "The policy and procedures set out in this statute reflect that there are certain crimes that can be prosecuted concurrently under Navajo Nation law and under 18 U.S.C. §§ 1151 and 1152 and other federal laws concerning generally applicable federal offenses." 17 N.N.C. § 1962. This sentence provides two takeaways. First, the statute's concern is Indians who face concurrent Navajo and federal prosecutions. By implication, the statute does not apply to Indians who are subject to only a federal investigation. Second, the statute acknowledges federal criminal jurisdiction in Indian Country. The statute thus harmonizes federal and Navajo jurisdiction when both sovereigns seek to prosecute and the Navajo already have custody of the suspect. But the statute is not a limitation on federal jurisdiction when the United States pursues someone suspected of violating only federal law.

The statute's third section specifies how the federal government may obtain custody of an Indian already in Navajo custody for a violation of Navajo law:

> If a Navajo Nation law enforcement officer, including those possessing a special law enforcement commission, makes an arrest, *he or she shall arrest an Indian under Navajo Nation law* and take him or her into Navajo Nation custody, if there is probable cause that a Navajo Nation offense has occurred. *Once the Indian is in Navajo Nation custody*, federal law enforcement may request transfer of the Indian to federal custody by submitting to the Director of the Navajo Department of Corrections, or his or her designee, a detainer request form providing the name of the requesting federal agency; the request date; the name of the inmate who is the subject of the detainer request; [and other information about the inmate, the federal criminal case, and the requesting federal agency or officer].

17 N.N.C. § 1963 (emphasis added). The first sentence provides that a Navajo officer will arrest an Indian for a violation of Navajo law and take that Indian into Navajo custody. But in some cases, the arrestee may also be suspected of a federal violation. In those cases, "*[o]nce the Indian is in Navajo Nation custody*," the federal government may also seek custody over the arrestee. *Id.* Once again, the statute does not specify extradition procedures for *every* Indian within the Navajo Nation who is suspected of violating federal law. Rather, the statute's procedures apply to Indians *who are already in Navajo custody for violating Navajo law*.

The statute's later reference to an "inmate who is the subject of the detainer request" confirms that the statute addresses Indians who are already in Navajo custody. *Id.* The fourth section of the statute, which details procedures that the Director of the Navajo Department of Corrections must follow, continues to address the subject of the detainer request as an "inmate." 17 N.N.C. § 1964. For example, the Director must "place a copy of the [detainer] request in the inmate's file." *Id.* This requirement narrows the meaning of "custody": the creation of a file with the Navajo Department of Corrections signals that the Indian is in Navajo custody under the statute.

Comparing the federal-detainer statute to Navajo Nation's state and tribal–extradition statute helps too. That statute mandates, "No Indian, whether an adult or juvenile, shall be removed

from the Navajo Nation by state or other tribal nation law enforcement except pursuant to the procedures set forth in this extradition statute." 17 N.N.C. § 1952. This categorical language is notably absent from the federal-detainer statute. Put differently, the state and tribal–extradition statute omits any language limiting the statute's focus to Indians already in Navajo custody for violating Navajo law.

Then, in the following section, the state and tribal–extradition statute continues,

> Whenever the President of the Navajo Nation . . . is informed and believes that an Indian . . . has committed a crime or juvenile delinquency offense under state or other tribal nation law and is present within the Navajo Nation, upon an extradition request by a state or other tribal nation law enforcement agency, the President . . . may order any Navajo police officer to apprehend such person, and deliver him or her to proper authorities in accordance with this extradition statute.

17 N.N.C. § 1952(A). This statute describes a limitation on the investigative and arrest jurisdiction of states and other tribes. States and other tribes cannot arrest and remove an Indian from Navajo Nation; the Navajo may arrest a suspect for these other sovereigns, following the statute's procedures. By contrast, the federal-detainer statute does not include a parallel provision that would (1) prohibit federal officers from arresting and removing an Indian who violated federal law and (2) require federal officers to request that Navajo Nation make the arrest for them. In sum, the statutes' differences corroborate that the federal-detainer statute does not limit federal arrest authority when a suspect is under investigation for violating only federal law. Rather, the statute enumerates procedures for the federal government to follow when the Navajo have already detained a suspect under Navajo law.

All in all, the Court interprets the federal-detainer statute as mandating procedures for the federal government to follow to gain custody of an Indian suspect who is *already* in Navajo custody for a violation of Navajo law. Because of this interpretation, the FBI agents did not violate the federal-detainer statute when they arrested Mr. Peshlakai.

11

### B.    Analysis

During the pursuit of Mr. Peshlakai, Investigator Yazzie requested and received FBI assistance. And when Mr. Peshlakai called NPD dispatch, he spoke with FBI agents. *See* ECF No. 1, ¶¶ 2, 10, 12. These facts show that Mr. Peshlakai surrendered himself for a federal violation.

To be sure, NPD officers first arrested Mr. Peshlakai outside the NPD station. And in his reply brief, Mr. Peshlakai alludes to different domestic-violence crimes under the Navajo Nation Code for which the NPD could have arrested him. *See* ECF No. 62, at 4, 6. But Mr. Peshlakai never presented actual evidence that the NPD officers arrested him for a Navajo violation. Because Mr. Peshlakai's theory of a Fourth Amendment violation requires showing a violation of the federal-detainer statute, Mr. Peshlakai had the burden of showing that the NPD officers arrested him for a violation of Navajo law. And because Mr. Peshlakai did not introduce evidence to satisfy this burden, the Court cannot assume that the NPD officers arrested him for a Navajo violation.

To the contrary, the Court finds that the NPD officers arrested Mr. Peshlakai to advance a federal investigation. Rather than allowing Mr. Peshlakai's booking process to unfold, Investigator Yazzie directed the NPD officers to remove Mr. Peshlakai from the booking area. Mr. Peshlakai then waited in a separate area for FBI agents to take him into federal custody. *See* Tr. Hr'g 52.

What is more, Mr. Peshlakai was never in Navajo custody, at least in the context of the federal-detainer statute. The NPD officers first brought him to the booking area, but then they removed him from that area before he was booked. *See* Tr. Hr'g 50-52. Mr. Peshlakai did not present the Court with a file in which the Director of the Navajo Department of Corrections could place a copy of a federal-detainer request. *Cf.* 17 N.N.C. § 1964. And no evidence suggests that Mr. Peshlakai became an "inmate" with the Navajo Department of Corrections.

At bottom, when FBI Agent Curtis Imming interviewed Mr. Peshlakai, Mr. Peshlakai was not previously in Navajo Nation custody for a violation of Navajo law. His federal arrest, therefore, does not implicate the Navajo Nation's federal-detainer statute. The Court will thus deny his Motion to Suppress.

## IV.     The United States' *Motion in Limine Regarding Testimony of the DNA Expert Analysis*

The United States seeks to call DNA Examiner Jerrilyn Conway to testify on "all matters relating to DNA testing in this case." ECF No. 51, at 1. Examiner Conway authored the report that concludes that Mr. Peshlakai's DNA is a possible match to the DNA collected from the firearms. Tr. Hr'g 57. But four other DNA forensic biologists participated in the DNA testing process: Zachary Curran, Eugenia Pontacq, Patricia Kramer, and Jessica McLamb. The question presented is whether Mr. Peshlakai's Sixth Amendment right to confrontation will be violated if the United States calls Examiner Conway as a witness without also calling the four biologists.

The Court will defer an answer on the admission of Examiner Conway's testimony or the recognition of Examiner Conway as an expert. Still, a narrower ruling is appropriate: based on the record before the Court—and subject to future changes in the record—the Sixth Amendment's Confrontation Clause neither bars Examiner Conway's testimony nor requires the United States to call the four other biologists.

### A.     Legal Background

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Because of this right, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Non-testimonial statements, by contrast, do not implicate the Confrontation

13

Clause. This motion thus turns on whether the four biologists and technicians made representations about the reference samples that were testimonial.

"A testimonial statement is a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'" *United States v. Morgan*, 748 F.3d 1024, 1038 (10th Cir. 2014) (alteration in original) (quoting *United States v. Smalls*, 605 F.3d 765, 777-78 (10th Cir. 2010)). This definition extends to laboratory evidence. Consider three landmark cases.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), held "that a forensic laboratory report stating that a suspect substance was cocaine ranked as testimonial for purposes of the Sixth Amendment's Confrontation Clause." *Bullcoming v. New Mexico*, 564 U.S. 647, 651 (2011). In *Melendez-Diaz*, police seized substances from the defendant. Chemists found the substances to contain cocaine. They signed certificates of analysis. Then, at trial, the prosecutor introduced the certificates. But the chemists themselves did not testify. The Court held that the chemists' absence violated the Confrontation Clause. *See* 557 U.S. at 308, 310-11.

In *Bullcoming v. New Mexico*, police seized a blood sample from the defendant after suspecting drunk driving. Forensic Analyst Curtis Caylor tested the blood sample. Analyst Caylor concluded that the blood alcohol content exceeded the threshold for aggravated DWI. But Analyst Caylor did not testify at the defendant's trial. Instead, the prosecution offered the testimony of Scientist Gerasimos Razatos and offered Analyst Caylor's findings as a business record. Scientist Razatos had not personally observed or reviewed Analyst Caylor's analysis. Still, Scientist Razatos testified about Analyst Caylor's method. The Court held that the Confrontation Clause demanded more. *See* 564 U.S. at 652-56, 663.

14

Neither *Melendez-Diaz* nor *Bullcoming*, however, require that "everyone who laid hands on the evidence must be called." 557 U.S. at 311 n.1. *Melendez-Diaz* emphasized that its holding was not limitless: "[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Id.* Concurring in *Bullcoming*, Justice Sotomayor explained that the case would be different if "the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." 564 U.S. at 672 (Sotomayor, J., concurring). So too, Justice Sotomayor distinguished *Bullcoming* from "a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.* at 673.

The third major case is *Williams v. Illinois*, 567 U.S. 50 (2012). There, Illinois State Police sent crime-scene DNA to Cellmark, a private lab. Cellmark returned a DNA profile. Sandra Lambatos, a forensic specialist at the Illinois State Police lab, conducted a computer search to see whether the Cellmark profile matched any entries in the state DNA lab. The search matched the defendant's blood sample from an unrelated arrest. *See id.* at 59 (plurality opinion).

Specialist Lambatos testified that the Cellmark profile matched the state-lab profile. *See id.* at 61-63. The Cellmark report was not admitted into evidence. *See id.* at 62. The defense argued that Specialist Lambatos's testimony about testing done by Cellmark violated the Confrontation Clause. *See id.* at 62-63. The trial judge admitted the testimony, which he found was "based on [Specialist Lambatos's] independent testing of the data received from [Cellmark]." *Id.* at 64 (second alteration in original).

The Supreme Court held that Specialist Lambatos's testimony satisfied the Confrontation Clause. *Id.* at 86. A four-justice plurality based its holding on two independent reasons. First, the

plurality found that the Cellmark report was non-testimonial because it was not discussed for the truth of its contents. *See id.* at 70-81. Second, the plurality applied the primary-purpose test to determine whether the Cellmark report was testimonial. *See id.* at 113 (Thomas, J., concurring) ("The original formulation of that test asked whether the primary purpose of an extrajudicial statement was 'to establish or prove past events potentially relevant to later criminal prosecution.'" (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006))). And under this test, the plurality concluded that the report was non-testimonial: "It plainly was not prepared for the primary purpose of accusing a targeted individual." *Id.* at 84 (plurality opinion).

*Williams* becomes difficult to apply, however, because of the disagreement of the justices. Five justices agreed that the Cellmark report was discussed for the truth of its contents. *See id.* at 109 (Thomas, J., concurring); *Id.* at 125-33 (Kagan, J., dissenting). And five justices agreed that the primary-purpose test is not appropriate for determining whether a statement is testimonial.[4] *See id.* at 113-14 (Thomas, J., concurring); *id.* at 135 (Kagan, J., dissenting).

The only reason that no Confrontation Clause violation occurred in *Williams* was Justice Thomas's fifth vote. In his view, the "Confrontation Clause regulates only the use of statements bearing 'indicia of solemnity.'" *Id.* at 111 (Thomas, J., concurring) (quoting *Davis*, 547 U.S. at 837 (Thomas, J., concurring)). And according to Justice Thomas, the Cellmark report bore no such indicia of solemnity. *Id.*

These three cases yield some confusion, especially in the context of DNA laboratories. *See, e.g.*, *Grim v. Fisher*, 816 F.3d 296, 309 (5th Cir. 2016) ("[T]he Supreme Court has not clearly established what degree of involvement with the forensic testing is required of an in-court witness

---

[4] In a later case, *Ohio v. Clark*, six justices signed on to the primary-purpose test. 576 U.S. 237, 246 (2015) ("[T]he primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause.").

offered to prove a particular fact in a testimonial certification, beyond what was deemed insufficient in *Bullcoming*."). Still, principles may be gleaned.

For example, Judge Briscoe explained that she would have found a Confrontation Clause violation in *United States v. Sedillo*, 509 F. App'x 676, 684 (10th Cir. 2013) (Briscoe, J., dissenting).[5] There, DNA Expert Carrie Zais testified about a laboratory report prepared by Stephanie Willard. *See id.* at 687. Relying on Williard's report, Expert Zais opined that the defendant's DNA profile matched the DNA profile recovered from a shotgun. *See id.* Williard's report was not admitted into evidence. Still, Expert Zais (1) "explained how Willard swabbed the textured parts of the stock, lever, safety, and trigger of the gun for DNA," (2) "described the quantitation process, a test to determine how much DNA is present, of the sample from the shotgun," (3) "reported that through the quantitation process, Willard determined that the sample was dirty," (4) "testified that Willard diluted the sample with water so that the sample could be tested," and (5) "testified to the amount of DNA recovered from the shotgun and control samples collected from other parts of the gun." *Id.* at 689.

Judge Briscoe distinguished *Williams*. She described how the *Williams* plurality's two reasons for holding inapplicable the Confrontation Clause cut the other way in *Sedillo*. First, Judge Briscoe would have held that Expert Zais's statements about Willard's report were offered for the truth of their contents. *See id.* ("Zais testified as to Willard's testing procedure, referred to Willard's report, and vouched for the quality of Willard's work."). Second, Judge Briscoe would have held that Willard's laboratory report was testimonial because Willard prepared the report

---

[5] The *Sedillo* majority decided the case on other grounds and thus did not address the Confrontation issue. *See* 509 F. App'x at 679.

with the primary purpose of creating trial evidence. *See id.* at 690. Judge Briscoe concluded that Expert Zais's testimony about Willard's report violated the Confrontation Clause. *See id.* at 691.

Compare Judge Briscoe's opinion to *United States v. Kaszuba*, 823 F. App'x 77, 79 (3d Cir. 2020). There, the Third Circuit affirmed the "introduction of the toxicology report through Dr. Coyer, the lab director, rather than through the technician who actually performed the testing." *Id.* at 79. Four facts justified the decision: (1) "Dr. Coyer compiled and signed the report," (2) "he reviewed every test the technicians conducted and every procedure they used" rather than simply "parrot[ing] what the non-testifying technician allegedly found during the testing," (3) "[h]e was well-equipped to convey what the technicians knew or observed about a particular test and process," and (4) "he could expose any lapses that could have occurred during testing." *Id.* (internal quotations omitted) (citing *Bullcoming*, 564 U.S. at 655, 657-58, 661-62).

Finally, the Supreme Court of Washington distilled a typical DNA analysis into five steps and explained how only the final step may implicate the Confrontation Clause. *State v. Lui*, 315 P.3d 493, 507-08 (Wash. 2014) (en banc); *see also Williams*, 567 U.S. at 90, 100 app. (Breyer, J., concurring) (illustrating six-step process and noting difficulty of drawing "Confrontation Clause" line at particular step). The United States provides a similar seven-step description of the DNA process here, including a description of each biologist's involvement. *See* Gov.'s Ex. 1 (ECF No. 60-1). The table below pairs the United States' exhibit with *Lui*'s analysis.

| Step (Gov.'s Ex. 1) | Biologist | Description (Gov's Ex. 1) | *Lui*'s Confrontation Analysis (315 P.3d at 507-08) |
|---|---|---|---|
| Collection | Zachary Curran; Eugenia Pontacq | Biologist swabs the evidence; labels each swab with barcode; swabs are cut; cuttings placed in separate, labeled test tubes. | "In no sense does an analyst become a 'witness' by extracting a sample for testing; the act is not testimonial because no statement has been made yet."[6] |
| Extraction | Zachary Curran | Biologist adds chemicals to swabs, incubates sample tubes; breaks open cells containing DNA; extracts liquid DNA. | "[N]o authority states that the analyst becomes a 'witness against' anyone by virtue of adding chemicals to a mixture." |
| Concentration | Patricia Kramer | Biologist places tubes in centrifuge to concentrate DNA extracts in lower volumes; dries sample until no liquid remains. | |
| Quantitation | Patricia Kramer; Jessica McLamb | Biologist uses machine to estimate amount of DNA obtained from extraction. | |
| Amplification | Jessica McLamb | Biologist uses machine to make millions of identical copies of DNA sections of interest. | "The process does not create new information, but only replicates already-existing DNA information. . . . [T]he analyst's role is to facilitate the operation of a machine, not to make any factual affirmation and not to serve as a 'witness against' anyone." |
| Separation | Jessica McLamb | Biologist places amplified DNA on instrument that separates DNA fragments by size, making it possible to visualize DNA profile. | "This step is fully automated; like the gas chromatograph that Justice Sotomayor discussed in . . . *Bullcoming*, it is not testimonial and does not invoke the confrontation clause." |
| Examination & Review | Jerrilyn Conway | Forensic Examiner imports raw data into software program to visualize DNA profile; analyzes DNA profiles; reviews laboratory notes of biologists. | "Unlike previous steps in the process, the DNA profile is an affirmation of fact; it is a conclusory statement that a given DNA donor has certain genetic characteristics." *Lui* then holds that Confrontation Clause applies when expert's testimony implicates defendant based on the DNA profile. |

---

[6] *Lui* might be wrong: the barcode on a test tube is perhaps an affirmation that the swab in the test tube came from the evidence. Still, the Confrontation Clause does not require everyone who makes this chain-of-custody style affirmation to be present. *See Melendez-Diaz*, 557 U.S. at 311 n.1 ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in

### B.      Analysis

Neither *Melendez-Diaz* nor *Bullcoming* bar Examiner Conway's testimony without the testimonies of the other biologists. Examiner Conway performed the final analysis, reviewed the final laboratory notes and data, and drew the relevant conclusions. *See* ECF No. 60-1, at 7. She is thus unlike the prosecutor who simply introduced the chemists' certificates in *Melendez-Diaz*. She is also unlike Scientist Razatos, who simply parroted Analyst Caylor's work in *Bullcoming*.

In fact, as the author of the final report, Examiner Conway seems to be the type of witness that Justice Sotomayor distinguished from Scientist Razatos in *Bullcoming*. *See* Tr. Hr'g 57. Examiner Conway appears to be a "supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Bullcoming*, 564 U.S. at 672 (Sotomayor, J., concurring). And the Court understands that the United States will ask Examiner Conway for her "independent opinion" about the underlying work of others. *Id.* at 673.

For similar reasons, the Court expects that Examiner Conway's testimony will differ from Expert Zais's testimony that concerned Judge Briscoe in *Sedillo*. The Court understands that Examiner Conway will do more than recite and agree with the conclusions of another biologist. *Cf. Sedillo*, 509 F. App'x at 689 (Briscoe, J., dissenting) ("As technical reviewer, Zais did not participate or observe the analysis that Willard conducted, but she reviewed Willard's case notes, Willard's conclusions in the report, and agreed with Willard's conclusions.").

Indeed, the record suggests that Examiner Conway's testimony will be much closer to that of Dr. Coyer in *Kaszuba*. First, the Court understands that Examiner Conway authored and signed the final report. *See Kaszuba*, 823 F. App'x at 79. Second, Examiner Conway "reviewed the

---

establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.").

laboratory notes and data created by each of the Biologists and agreed that all procedures had been completed appropriately." ECF No. 60-1, at 7; *see Kaszuba*, 823 F. App'x at 79. Third, Examiner Conway appears prepared to testify about what the other biologists knew or observed. *See id.* And fourth, because she "analyzed all resulting data and confirmed controls run alongside the evidence during processing produced the expected results," ECF No. 60-1, at 7, the Court expects that Examiner Conway would be able "expose any lapses that could have occurred during testing." *Kaszuba*, 823 F. App'x at 79 (citing *Bullcoming*, 564 U.S. at 661-62).

As for the seven-step DNA process, the Court is persuaded by *Lui*'s conclusion that biologists involved before the examination-and-review step are not witnesses whose absence would violate the Confrontation Clause. *See* 315 P.3d at 508. Because Mr. Peshlakai singled out the quantitation step at the hearing, however, the Court will discuss it here. *See* Tr. Hr'g 61.

Quantitation is the process of estimating the amount of DNA obtained from extraction. *See* ECF No. 60-1, at 4. And here, the United States concedes that its quantitation analysis perhaps had issues. In the first quantitation test, "the required diagnostics for controls were not met, and the quantitation step was deemed unsuccessful at that time." ECF No. 60-1, at 4. A second quantitation step was attempted, but "an instrument error caused the data to become corrupted and unreadable." *Id.* A technical leader determined that data from the first quantitation would be used to prepare samples in the next step. *See id.*

*Lui* did not discuss quantitation, but its discussion of other steps translates well to the quantitation step. If biologists (here, Biologists Kramer and McLamb) conducting quantitation only estimate the amount of DNA, then they do not become witnesses against a defendant. Just as replicating already-existing DNA information does not implicate the Confrontation Clause, *see Lui*, 315 P.3d at 507, neither does counting already-existing DNA information.

To see why, consider (at the risk of oversimplification) four statements:

1. At quantitation, a biologist affirms, "there is *X* amount of DNA."

2. At the next step, amplification, a biologist affirms, "Based on *X*, we will use *Y* amount of DNA extract for amplification."

3. An analyst affirms, "*X* is a sufficient amount for a successful DNA test."

4. An analyst affirms, "the biologist correctly calculated *Y* based on *X*, and thus enough DNA was replicated for a successful DNA test."

The first two statements do not implicate the Confrontation Clause. They are not conclusions that, by themselves, inculpate a defendant. Rather, they are facts that get passed along in a DNA lab. And they are facts that would be meaningless to a jury without interpretation or explanation. *See id.* at 508. The third and fourth statements, however, could inculpate a defendant. If a jury is presented with these statements, and a DNA test suggests a defendant's guilt, then the jury might rely on these statements as they decide whether to rely on the DNA test.

Based on the current record, the Court expects that Examiner Conway can offer "independent opinion[s]" about statements similar to three and four. *Bullcoming*, 564 U.S. at 672 (Sotomayor, J., concurring). Said otherwise, she will offer her own testimony on these statements and not surrogate testimony. Thus, subject to any new information that changes the Court's understanding of the laboratory process, the Court holds that the Confrontation Clause neither bars the United States from calling Examiner Conway nor requires the United States to call the four other biologists.

22

V.    **Conclusion**

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that

1. Mr. Peshlakai's *Motion to Dismiss Indictment for Lack of Jurisdiction or, in the Alternative, to Present Affirmative Defense Based on Treaty-Recognized Right to Bear Arms for the Purpose of Hunting and Protecting Livestock* (**ECF No. 52**) is **DENIED**;

2. Mr. Peshlakai's *Motion to Suppress Evidence* (**ECF No. 53**) is **DENIED**; and

3. The United States' *Motion in Limine Regarding Testimony of the DNA Expert Analyst* (**ECF No. 51**) is **GRANTED IN PART** and **DEFERRED IN PART**:

   a. The Court reserves ruling on the admissibility of Examiner Conway's testimony and the recognition of her as an expert; and

   b. The Sixth Amendment's Confrontation Clause neither bars Examiner Conway's testimony nor requires the United States to call the four other biologists who worked on this case.

_____
SENIOR UNITED STATES DISTRICT JUDGE